| | | |
|---|---|---|
| ECHO MAV, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:25-CV-401-TAV-JEM |
| | ) | |
| HORIZON31, LLC, and | ) | |
| BRAD STINSON, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This civil matter is before the Court on defendants' motion to dismiss [Doc. 13]. Plaintiff has responded in opposition [Doc. 16], and this matter is now ripe for the Court's review.  E.D. Tenn. L.R. 7.1(a).  For the reasons explained below, the Court will **GRANT in part** and **DENY in part** the motion to dismiss [Doc. 13].

## I.      Background

The complaint alleges that plaintiff Echo MAV, LLC ("Echo MAV") is a technology development company focused on defense-oriented drone innovation and systems integration, including the design, prototyping, and commercialization of specialized hardware and software for military and tactical applications [Doc. 1 ¶ 6].  Defendant Brad Stinson is the founder and managing member of defendant Horizon31, LLC ("Horizon31"), a company that was previously engaged in the development of unmanned aerial systems and related technologies [*Id.* ¶ 7].

Plaintiff alleges that on or about February 23, 2023, it and Horizon31 entered into a negotiated Asset Purchase Agreement ("Purchase Agreement") pursuant to which plaintiff

acquired substantially all of Horizon31's tangible and intangible assets, including certain intellectual property, operational systems, equipment, and business goodwill ("Purchased Assets") [*Id.* ¶ 8]. Plaintiff paid Horizon31 $500,000 at closing and executed a Promissory Note in the original principal amount of $1,500,000, which was secured by a Security Agreement executed March 10, 2023 [*Id.* ¶ 9]. The Security Agreement granted Horizon31 a security interest in "the tangible and intangible personal property acquired by Debtor, including general intangibles, goods, equipment, documents, contracts, and other miscellaneous property," which plaintiff alleges referred to the Purchased Assets [*Id.* ¶ 10]. However, plaintiff alleges that this collateral description does not include any language or reference to Horizon31 or Stinson obtaining a security interest in "after-acquired property," "newly developed intellectual property," "derivative works," "future revenue streams," or any assets beyond the Purchased Assets [*Id.* ¶ 11].

Thereafter, plaintiff independently developed and launched a new generation of drone products using proprietary systems and personnel who were not employed at Horizon31 [*Id.* ¶ 12]. Plaintiff alleges that these developments were funded solely by Echo MAV, without contribution or involvement from Stinson or Horizon31 [*Id.*]. Additionally, after the execution of the Purchase Agreement, Stinson served as Chief Technology Officer of Echo MAV, and, in this position, he was able to access Echo MAV's systems, physical locations, electronic databases, and proprietary information [*Id.* ¶ 13].

After closing, plaintiff allegedly discovered that certain representations concerning the state of Horizon31's business, specifically, the maturity of its government contracting pipeline, completeness of manufacturing files, and viability of ongoing vendor

2

relationships, were materially false or misleading [*Id.* ¶ 14]. Nonetheless, Echo MAV continued performing under the Purchase Agreement and Security Agreement including by making partial payments toward the secured debt and pursuing development of its business operations in good faith [*Id.* ¶ 15].

On or about March 21, 2025, after Stinson ceased working as Echo MAV's Chief Technology Officer, Stinson caused Horizon31 to initiate litigation against Echo MAV and William Knowles in the Knox County Circuit Court, which resulted in entry of an Agreed Judgment against Echo MAV and Knowles in the principal amount of $1,452,385.22 [*Id.* ¶ 16]. According to plaintiff, the Agreed Judgment reaffirmed Horizon31's rights only pursuant to the Security Agreement and did not expand or modify the scope of collateral or confer additional enforcement rights to Stinson [*Id.* ¶ 17].

Nonetheless, Stinson, acting in his capacity as owner and manager of Horizon31 "began engaging in a pattern of aggressive and unauthorized self-help conduct in a wrongful attempt to take control of Echo MAV's current business operations, intellectual property, vendor accounts, and customer relationships" [*Id.* ¶ 18]. Specifically, in or around April 2025, Stinson began restricting Echo MAV's access to its core internal systems, including disabling access to Slack communications, GitHub code repositories, and cloud-based vendor accounts used in the development and operation of Echo MAV's product lines [*Id.* ¶ 19]. Further, in or around May 2025, Stinson resigned from his position at Echo MAV, but thereafter entered Echo MAV's office premises without notice or permission [*Id.* ¶ 20]. Plaintiff alleges that Stinson deleted or disabled administrative user accounts tied to key engineering tools and refused to return credentials necessary for manufacturing

3

relationships with CircuitHub and other suppliers [*Id.* ¶ 21]. Further, Stinson contacted military procurement officials affiliated with entities with whom Echo MAV had active proposals or relationships, attempted to redirect payments to Horizon31, and made disparaging comments regarding Echo MAV's leadership [*Id.* ¶ 22]. Plaintiff alleges that Stinson thereafter engaged in a targeted deletion of internal files and records critical to the Monark Drone development program, which resulted in the temporary shutdown of Echo MAV's prototyping pipeline and required substantial resources to partially recover [*Id.* ¶ 23]. Plaintiff alleges that these actions "have caused immediate and continuing harm to Echo MAV's operations, including delays in deliverables to government partners, disruption of investor communications, reputational harm, and loss of goodwill with critical vendors" [*Id.* ¶ 24].

On May 23, 2025, Echo MAV sent a letter to Horizon31's counsel regarding Stinson's alleged interference [*Id.* ¶ 25]. The same day, Horizon31's counsel issued a letter asserting that Horizon31 was entitled to seize "all general intangibles" of Echo MAV, including any proceeds, derivative developments, or accounts arising from its current business [*Id.* ¶ 26]. Plaintiff alleges that this letter "confirms that Mr. Stinson is now attempting to improperly leverage the Security Agreement into a de facto claim over Echo MAV's entire business enterprise, including assets never contemplated by the original transaction" [*Id.* ¶ 27]. Plaintiff contends that Stinson's conduct "constitutes a deliberate, calculated effort to convert Echo MAV's business for the benefit of Horizon31 . . . by circumventing the judicial process and misusing limited rights under the Security Agreement" [*Id.* ¶ 28]. Further, despite multiple demands to return access, cease

4

interference, and refrain from direct contact with customers and vendors, Stinson has persisted in his efforts [*Id.* ¶ 29].

On June 12, 2025, Horizon31's counsel filed an Involuntary Petition for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of Tennessee, naming Echo MAV as the alleged debtor [*Id.* ¶ 30]. In subsequent written communications, Horizon31's counsel admitted that the Involuntary Petition was filed to exert pressure on Echo MAV to pay the disputed amount at issue in this action [*Id.* ¶ 32]. Plaintiff has challenged the Involuntary Petition in the bankruptcy court, arguing that it was filed in bad faith [*Id.* ¶ 33].[1] Nonetheless, "[o]n information and belief," defendants have communicated to third parties that Echo MAV is "in bankruptcy" without disclosing that the petition was involuntarily filed by defendants to gain litigation leverage and is being actively contested [*Id.* ¶ 34]. Plaintiff alleges that such statements are misleading and have further harmed its business reputation, business prospects, and investor relationships [*Id.*].

On or about August 6, 2025, plaintiff became aware that Stinson had directly or indirectly contacted representatives of Darley Defense, one of plaintiff's key military contracting partners [*Id.* ¶ 35]. "On information and belief," Stinson (1) disclosed sensitive information regarding Echo MAV's contract pricing, customer contacts, and payment arrangements; and (2) made statements suggesting that any money paid to Echo MAV might

---

[1] Subsequent to the filing of the complaint in this case, the bankruptcy court dismissed the bankruptcy proceeding on the ground that venue was not properly in the Eastern District of Tennessee [Case No. 3:25-bk-31122, Doc. 108]. However, the bankruptcy court also determined that "Horizon31, LLC did not file the involuntary petition in bad faith, and thus, Echo Mav, LLC is not entitled to 'damages proximately caused by such filing; or punitive damages' under 11 U.S.C. § 303(i)(2)" [*Id.* at 1].

5

be subject to seizure or clawback through court proceedings [*Id.* ¶¶ 36–37]. Plaintiff alleges that these statements caused confusion and concern and led to a breakdown in communication between Darley Defense and Echo MAV, with Darley Defense subsequently declining to participate in government solicitation involving Echo MAV products [*Id.* ¶¶ 38–39]. This disruption materially harmed plaintiff's credibility and ability to secure future contracts [*Id.* ¶ 40]. Plaintiff alleges that Stinson's communications with Darley Defense "were unauthorized, misleading, and made with the intent to interfere with Echo MAV's business relationships" [*Id.* ¶ 41].

On or about August 7, 2025, Stinson contacted Echo MAV's software engineer and stated that he intended to revoke access to the Horizon31 GitHub account by the end of the business day [*Id.* ¶ 42]. The Horizon31 GitHub account contains proprietary source code, project files, development logs, and related records essential to Echo MAV's ongoing engineering efforts [*Id.* ¶ 43]. The Purchase Agreement expressly identified the GitHub repository as an asset acquired by Echo MAV in the sale, but, in the years following the Purchase Agreement, Stinson never transferred control of the GitHub account to Echo MAV and retained unilateral authority over it [*Id.* ¶¶ 44–45]. Stinson's revocation of access has interfered with Echo MAV's ability to access, manage, and secure its software development materials, and, as a result, Echo MAV has incurred and continues to incur substantial damages, including direct financial loss, reputational harm, disruption to military contracts, legal expenses, and loss of confidential and proprietary data [*Id.* ¶¶ 46–47].

Plaintiff raises claims for (1) declaratory judgment; (2) fraudulent inducement; (3) tortious interference with business relationships; (4) conversion; (5) misappropriation of

6

trade secrets in violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1702, *et seq.*; (6) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; (7) breach of fiduciary duty (as to Stinson only); (8) unauthorized access to computers and electronic systems, in violation of the Tennessee Personal and Commercial Computer Act ("TPCCA"), Tenn. Code Ann. § 39-14-601, *et seq.*; (9) unauthorized access to protected computers, in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; and (10) abuse of process [*Id.* ¶¶ 48–149].

## II. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2) which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Specifically, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Finally, "a

7

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). However, the Court need not accept legal conclusions or unwarranted factual inferences as true. *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

## III. Analysis

### A. Count 2 – Fraudulent Inducement

Regarding plaintiff's claim of fraudulent inducement, defendants argue that the allegations are too general and conclusory to meet the particularity requirement of Federal Rule of Civil Procedure 9(b) [Doc. 14, p. 4]. Defendants note that Paragraph 59 of the complaint alleges that the misrepresentations were made orally and in writing, but does not state when or where the oral representations occurred, nor does it identify the writing purportedly containing misrepresentations [*Id.*]. Defendants contend that these allegations create the need to speculate as to what representations were made in the Purchase Agreement, which is not attached to the complaint [*Id.*].

8

Plaintiff responds that the allegations in the complaint supply the "who, what, when, where, and how" required by Rule 9(b) [Doc. 16, p. 10]. Specifically, the complaint identifies Stinson, acting on behalf of Horizon31, as the individual who made the misrepresentations [*Id.* at 8 (citing Doc. 1 ¶¶ 7, 58)]. The complaint also states that the representations "were made prior to execution and closing of the [Purchase Agreement] (i.e., during negotiations leading up to the Feb. 23, 2023 [Purchase Agreement])" [*Id.* at 8 (citing Doc. 1 ¶¶ 8, 58)]. The complaint specifies the types of representations that were made, specifically, that Horizon31's assets were fully transferrable, operational, and production-ready and that all intellectual property necessary for continued operation would be included in the transaction [*Id.* at 8–9 (Doc. 1 ¶¶ 59–60)].

Pursuant to Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Although Rule 9(b)'s special pleading standard is undoubtedly more demanding than the liberal notice pleading standard which governs most cases, Rule 9(b)'s special requirements should not be read as mere formalism, decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008) (internal citation omitted). Like Rule 8, Rule 9(b) exists to provide defendants with fair notice of the substance of a plaintiff's claim. *Id.* at 504. But Rule 9(b) "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a 'more specific form of notice' is necessary to permit a defendant to draft a responsive pleading." *Id.*

9

The Sixth Circuit has held that, to comply with Rule 9(b), a plaintiff must allege, at minimum, the time, place, and content of the alleged misrepresentation, the fraudulent scheme, the fraudulent intent, and the injury resulting from the fraud. *Id.* (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 501 F.3d 493, 503 (6th Cir. 2007)). And, generally, "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). "General allegations that raise the mere possibility of fraud will not do; instead, the complaint must provide the factual predicates necessary to convince [the Court] that the underlying fraud in all likelihood occurred." *Id.* at 615 (internal alterations and quotation marks omitted) (quoting *United States ex rel. Hirt v. Walgreen Co.*, 846, F.3d 879, 882 (6th Cir. 2017)).

Here, the Court finds that plaintiff has not met Rule 9(b)'s requirements, because, while it has, arguably, sufficiently pled the content of the alleged misrepresentations, it has not sufficiently pled either the time or the place of the alleged misrepresentations. Specifically, plaintiff alleges only that the misrepresentations were made by Stinson "[p]rior to the execution and closing of the" Purchase Agreement and that such misrepresentations were made "both orally and in writing" [Doc. 1 ¶¶ 58–59]. In its response, plaintiff states that it has adequately alleged the time of the misrepresentations, by stating that they were made "prior to the execution and closing of the [Purchase Agreement] (*i.e.*, during negotiations leading up to the Feb. 23, 2023 [Purchase Agreement])" [Doc. 16, p. 8]. But the complaint itself only alleges that the misrepresentations were made "[p]rior to the execution and closing of" the Purchase Agreement [Doc. 1 ¶ 58]. The complaint contains

10

no allegations that the alleged misrepresentations occurred during the course of negotiations leading to the execution of the Purchase Agreement. And a plaintiff's "failure to 'give even one date on which an alleged misrepresentation occurred' 'dooms' their 'ability to allege fraud with particularity.'" *Greer*, 114 F.4th at 616 (quoting *Am. BioCareInc. V. Howard & Howard Atty's PLLC*, 702 F. App'x 416, 422 (6th Cir. 2017)).

Further, despite plaintiff's contention that the complaint contains sufficient allegations of the "who, what, when, where, and how," [Doc. 16, p. 10], plaintiff does not address in its response how the complaint alleges the "where," or, in other words, the place of the alleged misrepresentations. Indeed, the complaint simply alleges that the misrepresentations were made "both orally and in writing," [Doc. 1 ¶ 59] without stating when or where the oral statements were made or in what document the written statements are contained. This is insufficient to meet Rule 9(b)'s particularity requirement. Accordingly, defendants' motion to dismiss is **GRANTED** as to this claim, and plaintiff's fraudulent inducement claim is **DISMISSED**.

### B.      Count 3 – Tortious Interference with Business Relationships

Next, defendants contend that plaintiff fails to state a claim for relief for tortious interference with business relationships because they have not shown that defendants acted with improper motive or means [Doc. 14, p. 7]. Defendants argue that Horizon31 is a secured creditor and judgment creditor of plaintiff that has legal rights and privileges to seek collection of the debt owed, including filing an involuntary bankruptcy proceeding and contacting other creditors or those known to be indebted to plaintiff to seek collection of the debt [*Id.*]. Further, defendants argue that plaintiff has not sufficiently alleged that their

11

predominate purpose was to injure plaintiff, as opposed to attempting to collect an unpaid debt and recover collateral [*Id.* at 8].

Plaintiff responds that defendants' argument depends on accepting their factual narrative while disregarding the complaint's detailed allegations of interference [Doc. 16, p. 13]. Plaintiff contends that the factual allegations in the complaint are concrete allegations of intentional interference by improper means [*Id.* at 13–14]. Plaintiff contends that, accepting the allegations of the complaint as true, any claim of creditor privilege raises factual questions that cannot be decided at the Rule 12(b)(6) stage [*Id.* at 14]. Plaintiff argues that the complaint alleges that defendant's primary purpose was to injure plaintiff rather than collect a legitimate debt, and the alleged outreach to military partners, deletion of files, and public insinuations of "bankruptcy" are not legitimate collection activities, but rather, acts of sabotage [*Id.*]. Plaintiff asserts that defendants' factual denials and self-characterizations of their conduct as "credit rights" are premature [*Id.* at 15].

The elements of a claim of interference with business relationships are:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Robinson v. City of Clarksville*, 673 S.W.3d 556, 580 (Tenn. Ct. App. 2023) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). At issue in this motion is whether plaintiff has sufficiently pled the fourth element: defendant's

12

improper motive or improper means. Plaintiff appears to argue that it has alleged both improper motive and improper means [*See* Doc. 16, pp. 13–14].

Turning first to whether plaintiff has sufficient alleged improper means, Tennessee defines "improper means" as "'methods that violate an established standard of a trade or profession' and 'sharp dealing, overreaching, or unfair competition.'" *BNA Associates, LLC v. Goldman Sachs Specialty Lending Grp.*, 63 F.4th 1061, 1064 (6th Cir. 2023) (quoting *Trau-Med*, 71 S.W.3d. at 701 n.7). Examples include violations of statues or rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty. *Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007).

In the complaint, plaintiff alleges that defendants interfered with plaintiff's business relationships by filing an involuntary bankruptcy petition against plaintiff and then disseminating "misleading statements suggesting [plaintiff] was insolvent or in bankruptcy" to damage plaintiff's relationships with partners, investors, and vendors and "to improperly coerce payment under disputed claims" [Doc. 1 ¶ 72]. Additionally, plaintiff alleges that Stinson contacted representatives of Darley Defense and disclosed confidential details of plaintiff's contracts and pricing, as well as making "false or misleading statements suggesting that funds paid to [plaintiff] could be seized through court proceedings" [*Id.* ¶¶ 74–75]. On their face, these allegations appear to fall within the categories that can constitute "improper means," such as "threats, bribery, unfounded litigation, fraud,

13

misrepresentation, defamation, duress, undue influence, misuse of confidential information," etc. *See Watson's Carpet*, 247 S.W.3d at 176.

Defendants' main point of contention is that such actions were not "improper," because, in defendants' opinion, they had a legal right to take such actions, based on its status as a creditor, and in light of the prior judgment between the parties [*See* Doc. 14, pp. 7–8]. But the Court does not find that the Rule 12(b)(6) stage is the appropriate stage to make such a determination, as such would necessarily involve findings on the factual disputes between the parties. And, at this stage, the Court "must construe the complaint in a light most favorable to plaintiff[], accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop*, 520 F.3d at 519. Applying this standard, the Court finds it inappropriate to determine whether defendants' alleged actions were legally permissible based on their status as a creditor at this juncture.

Although the parties also contest whether plaintiff has alleged improper motive, because the Court finds that plaintiff has at least alleged improper means, the Court need not address improper motive at this stage. *See Tennison Bros., Inc. v. Thomas*, No. W2013-01835-COA-R3-CV, 2014 WL 3845122, at *11 (Tenn. Ct. App. Aug. 6, 2014) (noting that it was unnecessary to consider "predominant purpose" when "improper means" existed). Because plaintiff has plausibly alleged improper means, defendants' motion to dismiss is **DENIED** as to this claim, and plaintiff's tortious interference with business relationships claim will proceed.

14

## C.    Count 4 – Conversion

Turning to plaintiff's conversion claim, defendants allege that the complaint "completely ignores the security interest held by Horizon31" in plaintiff's assets, as well as Horizon31's rights to take possession of collateral due to plaintiff's default under the Security Agreement [Doc. 14, p. 8]. Additionally, defendants argue that everything plaintiff alleges defendants converted is intangible property, and Tennessee law does not recognize a cause of action for conversion of intangible property [*Id.*].

Plaintiff responds that the complaint does not allege conversation of intangibles but rather, alleges seizure, deletion, and withholding of specific engineering schematics, design files, electronic systems, and credential information necessary for business operations, which are identifiable property capable of conversion under Tennessee law [Doc. 16, p. 15]. Plaintiff argues that the allegations that Stinson revoked access credentials, locked plaintiff out of shared cloud environments, deleted operational data, and diverted payments from plaintiff's vendor accounts to himself is conduct that is "the very essence of conversion" [*Id.*]. Further, plaintiff argues that defendant's invocation of a "secured creditor" right cannot excuse those actions because the complaint alleges that Stinson acted outside any legitimate claim of right and in direct violation of the limited scope of the Security Agreement [*Id.*].

To establish a prima facie claim of conversion under Tennessee law, a plaintiff must show: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387

S.W.3d 525, 553 (Tenn. Ct. App. 2012). "Tennessee law does not recognize claims for conversion of intangible property rights." *Family Trust Servs., LLC v. Green Wise Homes, LLC*, 693 S.W.3d 284, 307 (Tenn. 2024); *see also Wells v. Chattanooga Bakery, Inc.*, 448 S.W.3d 381, 392 (Tenn. Ct. App. 2014) ("Conversion is the wrongful appropriation of another's tangible property; an action for the conversion of intangible property is not recognized in Tennessee").

As an initial matter, for the same reasons discussed *supra*, the Court does not find it appropriate to make a factual determination regarding defendants' authority to take specific actions at the Rule 12(b)(6) stage, as the Court "must construe the complaint in a light most favorable to plaintiff[], accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop*, 520 F.3d at 519.

Accordingly, the only issue properly before the Court with regard to plaintiff's conversion claim is whether the claim relates to tangible or intangible property. The complaint alleges that defendants converted the following property: "account credentials for cloud platforms, internal systems, and repositories; proprietary design files, schematics, and embedded firmware; and access portals and operational infrastructure" [Doc. 1 ¶ 86].

Black's Law Dictionary defines "intangible property" as "[p]roperty that lacks a physical existence" such as "stock options and business goodwill." *Property*, BLACK'S LAW DICTIONARY (12th ed. 2024). On the other hand, "tangible property" is "[p]roperty that has physical form and characteristics." *Id*. Applying this definition of "intangible property," the Tennessee Court of Appeals has concluded, in the context of a tax law issue,

that "computer software constitutes intangible personal property."  *Sap Am., Inc. v. Gerregano*, No. M2024-01399-COA-R3-CV, 2026 WL 1318338, at *6 (Tenn. Ct. App. May 13, 2026).

Based on this definition, the three categories of property plaintiff cites, (1) account credentials, (2) design files, schematics, and embedded firmware, and (3) access portals and operational infrastructure [Doc. 1 ¶ 86], appear to be best defined as intangible property as they do not have "physical form and characteristics."  *See Property*, BLACK'S LAW DICTIONARY (12th ed. 2024).  The property interest at issue with the first category is the ability to access applicable systems and/or repositories, and the ability to access such systems is most appropriately categorized as "intangible."  Further, files, schematics, and embedded firmware, while possible to be stored on tangible property, are themselves intangible.  *See Gerregano*, 2026 WL 13138338, at *6.  Finally, "access portals and operational infrastructure," while somewhat vague, appears to refer to rights to access or digital environments, which are not tangible property.

Seeming to recognize that the property at issue is intangible, plaintiff cites *PNC Multifamily Capital Institutional Fund XXVI Limited Partnership v. Bluff City Community Development Corporation*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) as "recognizing conversion of intangible property when it is 'specific and capable of identification'" [Doc. 16, p. 15].  But this is a misstatement of *PNC Multifamily*.  The specific quote plaintiff references states that "the general rule is that money is an intangible . . . [,] [h]owever, there is an exception where *the money* is specific and capable of identification . . . ."  *PNC Multifamily*, 387 S.W.3d at 553 (quoting 90 C.J.S. *Trover and Conversion* § 16 (2012))

17

(emphasis added). But money is not the property at issue for plaintiff's conversion claim [*See* Doc. 1 ¶ 86]. Accordingly, *PNC Multifamily* provides no support for plaintiff's position that the property at issue here is tangible.

Accordingly, the Court concludes that plaintiff has not stated a plausible claim for conversion under Tennessee law, as the claim relates solely to intangible property, which cannot support a claim for conversion. Defendants' motion to dismiss will therefore be **GRANTED** as to this claim, and plaintiff's claim for conversion will be **DISMISSED**.

### D. Counts 5 & 6 – Misappropriation of Trade Secrets (Tenn. Code. Ann. § 47-25-1702 & 18 U.S.C. § 1836)

Defendants argue that the allegations regarding misappropriation of trade secrets are entirely conclusory [Doc. 14, p. 10]. Defendants state that even plaintiff's description of the alleged "trade secrets" is conclusory and inadequate [*Id.*]. Additionally, plaintiff's claims rest on the false premise that plaintiff has sole and exclusive ownership of its assets and ignores the undisputed security interest and lien rights of the defendants [*Id.*]. Horizon31, as a secured creditor and judgment creditor, has potential legal claims and rights in plaintiff's assets, including any trade secrets [*Id.* at 11]. Further, defendants conten that there is no plausible explanation in the complaint for how defendants allegedly wrongfully "used and/or disclosed" any trade secret [*Id.*]. Finally, the complaint does not plausibly allege damages as to these claims [*Id.*].

Plaintiff responds that the complaint identifies trade secrets with specificity, including proprietary source code, operational firmware, manufacturing templates, and technical schematics supporting the Monark Drone and related payload systems [Doc. 16,

18

p. 16 (citing Doc. 1 ¶¶ 92, 104)]. The complaint also details specific acts of misappropriation, namely, after Stinson's role was terminated, defendants "retained, used, and disclosed" proprietary files, replicated repository structures, disabled plaintiff's access, and used the stolen materials to interfere with plaintiff's operations, restrict system access, and contact plaintiff's business partners and vendors for competitive standing [*Id.* (citing Doc. 1 ¶¶ 19-23, 94–97, 107–08)]. The complaint clearly alleges that Stinson continued to access, utilize, and alter files after he had no claim of right to do so [*Id.* at 17]. Further, plaintiff asserts that the complaint pleads damages with specificity, alleging losses from "disruption to product development, reputational injury, and the need to rebuild secure infrastructure" [*Id.* (citing Doc. 1 ¶¶ 100, 109)].

"'[T]he elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff.'" *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (quoting *PartyLite Gifts Inc. v. Swiss Colony Occasions*, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006)). Because claims under either DTSA or TUTSA involve substantially the same elements, "they can be analyzed together." *In re Island Indus., Inc.*, No. 23-5200, 2024 WL 869858, at *2 (6th Cir. Feb. 29, 2024) (citing *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., LP.*, 602 F. Supp. 3d 1059, 1065 (M.D. Tenn. 2022), *aff'd on other grounds*, 63 F.4th 1061 (6th Cir. 2023)).

As an initial matter, for the same reasons discussed *supra*, the Court does not find it appropriate to make a factual determination regarding defendants' authority to take specific actions at the Rule 12(b)(6) stage, as the Court "must construe the complaint in a light most

19

favorable to plaintiff[], accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop*, 520 F.3d at 519. Accordingly, the Court will turn to whether, accepting the allegations of the complaint as true, plaintiff has pled each of the elements of a claim under the DTSA and/or the TUTSA.

While defendants challenge each element of a claim under the DTSA and/or the TUTSA, the Court ultimately finds it need not address whether plaintiff has pled the existence of trade secrets or damages, because plaintiff has not adequately pled the misappropriation element.

Regarding misappropriation, defendants note that Stinson was previously plaintiff's Chief Technology Officer, and, therefore, would have been familiar with any trade secrets, and plaintiff does not plead that Stinson accessed anything about which he was not already aware [Doc. 14, p. 11]. Rather, the complaint alleges that defendants "retained, used and/or disclosed" the trade secrets, but does not state how, when, or to whom defendants allegedly disclosed the trade secret [*Id.*].

The DTSA and the TUTSA define "misappropriation" as

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

20

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2); *see also* 18 U.S.C. § 1839(5) (containing a near identical definition).

In the complaint, plaintiff alleges that defendants obtained access to plaintiff's trade secrets in the course of Stinson's prior employment with plaintiff and maintained access after his resignation, but "[r]ather than returning or safeguarding this information, Defendants retained, used and/or disclosed it in ways adverse to" plaintiff [Doc. 1 ¶ 94]. Specifically, defendants "withheld credentials and design files necessary for manufacturing and operations," "threatened to exercise dominion over these assets," "disseminated disparaging claims to government partners that relied upon their access to non-public knowledge," and "retained control of accounts containing confidential technical documentation" [*Id.* ¶¶ 95–98].

Accordingly, it does not appear that plaintiff is alleging that defendants acquired the alleged trade secrets by improper means.[2] Rather, it appears that plaintiff presents a theory

---

[2]     The complaint does allege that "Defendants' actions constitute knowing misappropriation of trade secrets . . . including both unauthorized acquisition and unauthorized use of protected information" [Doc. 1 ¶ 99]. However, the facts alleged in the complaint specifically

21

that defendants used and/or disclosed the purported trade secrets that Stinson properly acquired during his tenure with plaintiff. But the complaint largely contains conclusory allegations that defendants used and disclosed the alleged trade secrets [Doc. 1 ¶¶ 94, 108]. Such "formulaic recitation of a cause of action's elements" is insufficient to meet the notice pleading requirements of Rule 8. *Twombly*, 550 U.S. at 545.

Plaintiff alleges four manners in which defendants allegedly used or disclosed the purported trade secrets: (1) "with[olding] credentials and design files necessary for manufacturing and operations," (2) "threaten[ing] to exercise dominion over these assets," (3) "disseminat[ing] disparaging claims to government partners that relied upon their access to non-public knowledge," and (4) "retain[ing] control of accounts containing confidential technical documentation" [Doc. 1 ¶¶ 95–98]. Of these four allegations, only the third, that is, "disseminat[ing] disparaging claims" could reasonably be construed as alleging a "disclosure." The remaining allegations could only reasonably be construed as alleging a "use." The Court will address whether each of these allegations sufficiently alleges a "disclosure" or "use" in turn.

The Court first examines plaintiff's allegation of disclosure. As stated, the complaint alleges that defendants "disseminated disparaging claims to government partners that relied upon their access to non-public knowledge" [Doc. 1 ¶ 97]. This is no more than a conclusory statement reciting an element of the claim(s). And, indeed, this allegation does

---

state that defendants acquired knowledge of the purported trade secrets "by virtue of Defendant Mr. Stinson's former position with Echo MAV and his access to company systems and credentials" [*Id.* ¶ 107]. Plaintiff provides no further allegation as to how Stinson's acquisition of the trade secrets during his employment with plaintiff would be "unauthorized."

22

not even allege that the "disparaging claims" were based on "trade secrets" but merely "non-public knowledge" [*Id.*]. Elsewhere in the complaint, plaintiff alleges the following regarding contacting government partners:

> (1) Stinson contacted military procurement officials with entities with whom plaintiff had active proposals or relationships and attempted to redirect payments to Horizon31 and made disparaging comments about plaintiff's leadership [*Id.* ¶ 22];
>
> (2) Defendants communicated to third parties that plaintiff was in bankruptcy without disclosing that the bankruptcy petition was involuntarily filed and being actively contested [*Id.* ¶ 34]; and
>
> (3) Defendants contacted representatives of Darley Defense and disclosed sensitive information concerning "contract pricing, customer contacts, and payment arrangements" and suggested that money paid to plaintiff might be subject to seizure or clawback through court proceedings [*Id.* ¶¶ 35–37].

Accordingly, at most, plaintiff has alleged that defendants disseminated information regarding direction of payments, opinions of plaintiff's leadership, the pending bankruptcy proceeding, and "contract pricing, customer contacts, and payment arrangements" [*Id.* ¶¶ 22, 34–37]. But none of that information falls within the scope of the purported trade secrets plaintiff has alleged, namely, "[c]ustom system architecture and firmware configurations[,]" "[e]ngineering schematics and design files for military-compatible circuit boards[,]" "[s]upply chain documentation and vendor pathways for manufacturing and assembly[,]" "[i]nternally developed manufacturing tolerances, performance metrics, and test procedures[,]""[credentialed access to platforms containing proprietary development materials and partner information[,]" and "proprietary software code, drone platform specifications, hardware schematics, firmware configurations, performance metrics, engineering documentation, and supply chain data" [*Id.* ¶¶ 92, 104]. Accordingly, plaintiff

23

has not plausibly alleged "disclosure . . . *of a trade secret*," for purposes of the DTSA or the TUTSA, even assuming that the listed "trade secrets" qualify as such under those statutes. Tenn. Code Ann. § 47-25-1702(2) (emphasis added); *see also* 18 U.S.C. § 1839(5).

Turning to the allegations that could be construed as alleging a "use" of trade secrets, the Court again notes that plaintiff alleges that defendants "withheld credentials and design files necessary for manufacturing and operations," "threatened to exercise dominion over these assets," and "retained control of accounts containing confidential technical documentation" [Doc. 1 ¶¶ 95–96, 98]. "Elsewhere in the complaint plaintiffs allege the following:

> (1) Stinson restricted and/or disabled access to "core internal systems" [*Id.* ¶ 19];
>
> (2) Stinson "deleted or disabled administrative user accounts" and "refused to return credentials necessary for manufacturing relationships" [*Id.* ¶ 21];
>
> (3) Defendants engaged in a "targeted deletion of internal files and records critical to the Monark Drone development program" [*Id.* ¶ 23]; and
>
> (4) Stinson revoked access to Horizon31's GitHub account [*Id.* ¶¶ 42–43].

Ultimately, all of these allegations amount to a claim that defendants deleted or restricted access to certain systems, information, accounts, or files. However, "[t]he plain language of TUTSA [and DTSA] . . . is clear that 'misappropriation' is limited to the 'acquisition,' 'disclosure,' or 'use' of trade secrets. As a result, the deletion of data is not covered by DTSA or TUTSA's definition of 'misappropriation.'" *LifeLinc Anesthesia, PLLC v. Wolfe*, No. 2:12-cv-2662, 2012 WL 13026748, at *2 (W.D. Tenn. Nov. 1, 2012) (internal citation omitted). Accordingly, the Court finds that plaintiff has also not plausibly alleged that

24

defendants "use[d]" a trade secret, even if the "trade secrets" listed in the complaint qualified as "trade secrets" under the DTSA and/or TUTSA. *See* Tenn. Code Ann. § 47-25-1702(2); *see also* 18 U.S.C. § 1839(5).

For all these reasons, the Court concludes that plaintiff has not plausibly alleged that defendants misappropriated any trade secret. Defendant's motion to dismiss will therefore be **GRANTED** as to these claims, and plaintiff's claims under the DTSA and the TUTSA will be **DISMISSED**.

### E. Count 7 – Breach of Fiduciary Duty

As to breach of fiduciary duty, Stinson argues that this claim is based on the allegation that he served as the Chief Technology Officer for plaintiff, but such title does not make him an "officer" within the meaning of Tennessee law [Doc. 14, pp. 12–13]. Rather, he must have been officially delegated rights and powers in writing, but the complaint identifies no such writing [*Id.* at 13]. Stinson further argues that the complaint alleges that he breached a fiduciary duty after he resigned his employment with plaintiff, but his fiduciary duties terminated along with his employment [*Id.* (citing *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 604 (Tenn. Ct. App. 1998))].

Plaintiff responds that under Tennessee law, an "officer" includes any individual who "manages and controls the business and affairs of the LLC" [Doc. 16, p. 17 (citing Tenn. Code Ann. § 48-249-401(e))]. Plaintiff asserts that the factual allegations describe this type of managerial and controlling authority [*Id.* at 18 (citing Doc. 1 ¶¶ 6–7, 13, 113–14)]. Further, plaintiff contends that Stinson mischaracterizes the timeline, as the

25

complaint alleges that Stinson's actions were conducted during and immediately leading up to his resignation [*Id.* (citing Doc. 1 ¶¶ 19–24, 114–16)].

The elements of a claim of breach of fiduciary duty in Tennessee are: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *In re Estate of Potter*, No. W2016-01809-COA-R3-CV, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017).

Plaintiff's claim of breach of fiduciary duty against Stinson is clearly based on his former position of Chief Technology Officer at plaintiff [*See* Doc. 1 ¶ 113 ("As Chief Technology Officer, Defendant Mr. Stinson held a position of trust and confidence.")]. "It is axiomatic that the officers and directors of a corporation owe a fiduciary duty to the corporation and to its shareholders." *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000). However, here, plaintiff is not a "corporation," but rather, a limited liability company, or "LLC" [Doc. 1 ¶ 1]. Accordingly, the first question the Court must address is whether Stinson owed plaintiff fiduciary duties as a result of his position as Chief Technology Officer.

Tennessee Code Annotated § 48-249-401, regarding management of LLCs, states that "[t]he LLC documents or the members, managers or directors of an LLC, by a resolution or other writing, may delegate rights and powers to manage and control the business and affairs of the LLC to one (1) or more officers, agents or employees, who need not be members of the LLC; provided that such delegation is reasonable under the circumstances and made in good faith." Tenn. Code. Ann. § 48-249-401(e). Under Tennessee Code Annotated § 48-249-403(j), officers of an LLC are required to discharge

26

their duties as an officer "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the officer reasonably believes to be in the best interests of the LLC." Tenn. Code Ann. § 48-249-403(j).

Stinson argues that plaintiff has not plausibly alleged that he owed plaintiff fiduciary duties because it merely alleges that he held the title of "Chief Technology Officer" but does not include any allegations regarding any "resolution or other writing" in which the members, managers, or directors of plaintiff delegated rights and powers to officers, as required under § 48-249-401(e) [Doc. 14, p. 13]. While true that plaintiff does not specifically allege that it created officer positions within its LLC in compliance with § 48-249-401(e), the Court is not convinced that the complaint is required to set forth such technicalities to meet Rule 8's notice pleading standard. Plaintiff alleges that Stinson was its Chief Technology Officer for a period, and that, as a result, he held a position of trust and confidence within the LLC [Doc. 1 ¶ 113]. The reasonable inference from that allegation is that Stinson was an officer of the LLC within the meaning of Tennessee law. And "[d]ismissal under Rule 12(b)(6) is warranted 'only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief.'" *Estate of Barrows v. Humana, Inc.*, No. 3:23-cv-654, 2025 WL 2375645, at *3 (W.D. Ky. Aug. 15, 2025) (quoting *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008)). In consideration of this standard, the Court finds that the complaint alleges sufficiently that Stinson was an officer of the LLC.

27

The inquiry does not end there, however, as Stinson also argues that all of the alleged actions in the complaint occurred after he resigned as Chief Technology Officer at plaintiff [Doc. 14, p. 13]. Plaintiff disagrees, stating that the complaint alleges that Stinson's actions "were not confined to the period after his departure—they were conducted during and immediately leading up to his resignation" [Doc. 16, p. 18].

The complaint is far from a model of clarity as to the timeline of Stinson's alleged employment with plaintiff as Chief Technology Officer. The complaint alleges that the relevant Purchase Agreement was signed on February 23, 2023 [Doc. 1 ¶ 8]. Beginning at some unspecified time "following the transaction," Stinson began serving as plaintiff's Chief Technology Officer [*Id.* ¶ 13]. On or about March 21, 2025, however, "after Stinson ceased working as the Chief Technology Officer at Echo MAV," Stinson allegedly caused Horizon31 to initiate litigation against plaintiff [*Id.* ¶ 16; *see also* Doc. 1-2 (copy of Agreed Order between the parties)]. The complaint alleges that Stinson began taking various actions in April and May of 2025 [Doc. 1 ¶¶ 19–22], and "[i]n or around May 2025, Mr. Stinson resigned from his position at Echo MAV and ceased holding any formal role at the company" [*Id.* ¶ 20].

Thus, it appears that there is some inconsistency within the complaint, and it is unclear whether Stinson ceased acting as plaintiff's Chief Technology Officer sometime before March 21, 2025, as alleged in Paragraph 16, or in May 2025, as alleged in Paragraph 20. If the former is the correct date, then the actions alleged in the complaint occurred after Stinson ceased working as plaintiff's Chief Technology Officer. If the latter is the correct date, then the actions alleged in the complaint occurred the month before and the same

28

month as Stinson ceased working as plaintiff's Chief Technology Officer. The Court again reiterates that, at the Rule 12(b)(6) stage, it must "determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop*, 520 F.3d at 519. Because the allegation in Paragraph 20 would support a conclusion that Stinson's alleged actions occurred both before and after he ceased working as plaintiff's Chief Technology Officer, the Court cannot determine that plaintiff can prove no set of facts that would entitle it to relief on its breach of fiduciary duty claim.

Moreover, neither party addresses whether the complaint adequately alleges any claim of breach of fiduciary duties that continue after an LLC's officer's tenure. And, the Court notes, the complaint alleges that Stinson breached fiduciary duties both during and "after his tenure, as Tennessee courts recognize that certain fiduciary obligations—such as confidentiality and good-faith—can survive formal termination in matters involving misuse of insider information" [Doc. 1 ¶ 116].

Accordingly, defendants' motion to dismiss is **DENIED** as to this claim. Plaintiff's claim for breach of fiduciary duty will proceed.

### F.    Counts 8 & 9 – Unauthorized Access to Computers and Electronic Systems (Tenn. Code Ann. § 39-14-601 & 18 U.S.C. § 1030)

Regarding the unauthorized access to computers claims, defendants contend that the complaint contains no mention of the nature or configuration of plaintiff's computer system or how any computer was actually damaged [Doc. 14, p. 13]. The allegation of damages in Paragraph 128 is a simple repetition of that contained in plaintiff's tortious interference and trade secrets claims, without distinguishing any damages caused by the alleged access to

29

computers [*Id.* at 14]. Additionally, defendants contend that the allegations show that the purported activity did not involve plaintiff's computer systems, but rather, third-party systems that plaintiff simply used [*Id.*]. Defendants argue that the complaint requires the Court to speculate as to how and to what extent accessing such third-party platforms allegedly damaged plaintiff's computers [*Id.*].

Plaintiff responds that the allegations in the complaint meet the statutory elements of (1) unauthorized access and (2) resulting damage or loss [Doc. 16, p. 19 (citing Doc. 1 ¶¶ 19–24, 122–25, 128)]. Plaintiff contends that the fact that systems are third-party platforms misses the point; the complaint alleges that the accounts, repositories, and virtual servers were plaintiff's protected digital workspaces used to store source code, schematics, and communications integral to its business [*Id.* (citing Doc. 1 ¶¶ 19–22, 123, 132)]. Courts have recognized that virtual environments and cloud-based systems qualify as "protected computers" if plaintiff owns or controls the accounts through which data and operations are managed [*Id.* at 19–20 (citing *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 303 (6th Cir. 2011))]. Finally, plaintiff argues that the complaint pleads operational disruption, data loss, and cost of restoring compromised systems, which are each recognized as "losses" under 18 U.S.C. § 1030(e)(11) and Tennessee Code Annotated § 39-14-602(b) [*Id.* at 20].

In relevant part, the TPCCA makes it "an offense to intentionally and without authorization, directly or indirectly: (A) [a]ccess any computer, computer system, or computer network[.]" Tenn. Code Ann. § 39-14-602(b)(1). And "[a]ny person whose property or person is injured by reason of a violation of any provision of this part may file

30

a civil action and recover for any damages sustained and the costs of the civil action. Without limiting the generality of the term, 'damages' shall include loss of profits." Tenn. Code Ann. § 39-14-604(a). Thus, the TPCCA requires proof of actual damages. *McKamey v. Yerace*, No. 1:24-cv-37, 2026 WL 1117080, at *9 (M.D. Tenn. Jan. 15, 2026).

Similarly, the CFAA makes it an offense to "intentionally access[] a protected computer without authorization, and as a result of such conduct cause[] damage and loss." 18 U.S.C. § 1030(a)(5)(C). Likewise, the statute provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator . . . ." 18 U.S.C. § 1030(g). However, a civil action is only permitted "if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.* In relevant part, the factor set forth in subsection (c)(4)(A)(i)(I) is "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]" 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Defendants contest whether plaintiff has adequately stated damages under either the TPCCA or the CFAA, arguing (1) that the allegations of damages are too conclusory, and (2) because the computer systems at issue were third-party platforms, it is unclear how plaintiff's computers were damaged [Doc. 14, p. 14]. The complaint alleges that the alleged unauthorized access to its systems "materially interfered with plaintiff's operations, delayed time-sensitive commercial obligations, disrupted communications, and contributed to the misappropriation of confidential materials and trade secrets" [Doc. 1 ¶ 128]. Plaintiff also alleges that it suffered losses "including costs of investigating the intrusions, restoring

31

access, rebuilding systems, and securing infrastructure," and that such losses exceeded $5,000 within a 1-year period [*Id.* ¶ 136].

As to defendants' argument that the complaint's statement of damages are too conclusory, the Court disagrees. Particularly, the Court notes plaintiff's allegation that it incurred costs related to investigation of the unauthorized access, costs to restore access to its systems and rebuild systems, as well as to secure infrastructure relating to affected systems [*Id.* ¶ 136]. At the pleading stage, this is sufficient to place defendants on notice of the damages purportedly arising as a result of the alleged unauthorized access, and therefore, is sufficient to meet Rule 8's notice pleading standard.

Further, as to the argument that plaintiff has not pled damages to its own computers as a result of the purported unauthorized access because the systems at issue were third-party systems, the Court notes that neither the TPCCA nor the CFAA's language limits the damages to damages to the injured party's computer. Rather, the TPCCA permits civil recovery for "[a]ny person whose *property or person is injured* . . . for *any damages sustained* and the costs of the civil action." Tenn. Code Ann. § 39-14-604(a) (emphasis added). Likewise, the CFAA permits recovery for "*damage or loss* by reason of a violation of this section[.]" 18 U.S.C. § 1030(g). Moreover, defendants cite no case law in support of their contention that the damages under either statute are limited to damages to a plaintiff's own computer or computer system and cannot extend to damages related to third-party systems. Accordingly, the Court finds that defendants have not met their burden of proving that no claim exists. *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross*

32

*and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) ("The moving party has the burden of proving that no claim exists").

For all of these reasons, defendants' motion to dismiss is **DENIED** as to these claims, and plaintiff's claims under the TCPPA and CFAA will proceed.

### G.      Count 10 – Abuse of Process

Defendants argue that plaintiff's claim for abuse of process is "frivolous" [Doc. 14, p. 15]. Defendants argue that plaintiff is in default of its obligations under the Promissory Note and Security Agreement, and any clam that the obligation is "disputed" is contradicted and demonstrably false in light of the Agreed Judgment [*Id.* at 15–16]. Defendants also assert that it is apparent from the complaint that plaintiff is not cooperating in the return of collateral [*Id.* at 16]. Thus, asserting that defendants utilized a statutory procedure created for such circumstances fails to state a claim for relief [*Id.*].

Plaintiff responds that, for purposes of this action, it does not allege that the filing of the bankruptcy petition was per se wrongful, but that defendants weaponized the bankruptcy process to freeze plaintiff's accounts, spread false claims of insolvency, and coerce control of company assets [Doc. 16, p. 21]. Tennessee allows such claims for when properly issued legal process is "directed outside its lawful course to the accomplishment of some object other than that for which it is provided" [*Id.* (citing *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999))]. The complaint alleges defendants admitted to filing and publicizing the bankruptcy petition to exert pressure on plaintiff to pay a disputed debt [*Id.*]. Those allegations plausibly allege that the process was used to compel a collateral result outside the purpose for which bankruptcy

33

exists [*Id.*]. Further, the argument that defendants acted within their rights as creditors asks the Cour to credit defendants' version of events and disregard the complaint's allegations [*Id.*].

"To establish a claim for abuse of process in Tennessee . . . two elements must be alleged: '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *Bell*, 986 S.W.2d at 555 (quoting *Priest v. Union Agency*, 125 S.W.2d 142,143 (Tenn. 1939)). "Mere initiation of a law suit, though accompanied by a malicious ulterior motive, is not abuse of process." *Bell*, 986 S.W.2d at 555. Rather, "abuse of process lies only 'for the improper use of process *after* it has been issued, not for maliciously causing process to issue.'" *Id.* at 556 (emphasis in original) (quoting *Priest*, 125 S.W.2d at 143).

Here, plaintiff's abuse of process claim is based on defendants' filing of an involuntary petition for bankruptcy against plaintiff, and then using the existence of such bankruptcy proceeding "to publicly malign [plaintiff], chill its government contracting efforts, and force a premature concession in this litigation" [Doc. 1 ¶¶ 141, 146]. But, confusingly, in its response to the motion to dismiss, plaintiff denies that the filing of the bankruptcy petition itself is the basis for the abuse of process claim and asserts that "Defendants weaponized the bankruptcy process—using it to freeze [plaintiff's] accounts, spread false claims of insolvency, and coerce control of the company's assets well beyond any legitimate collection purpose" [Doc. 16, pp. 20–21]. Problematically, the allegations in the complaint do not contain the same allegations plaintiff raises in its response brief, and the Court's role at the Rule 12(b)(6) stage is to determine whether the allegations *in the*

34

*complaint* sufficiently state a claim for relief. Plaintiff's response brief is the only time mention is made of defendants improperly freezing accounts or coercing control of plaintiff's assets [Doc. 16, p. 21]. The complaint, on the other hand, only alleges that (1) "the involuntary bankruptcy petition was filed . . . to exert pressure on [plaintiff] to pay a disputed debt" and/or "force a premature concession in this litigation"; and (2) defendants communicated to third parties that plaintiff was in bankruptcy "to publicly malign [plaintiff]" and "chill its government contracting efforts" [Doc. 1 ¶¶ 143, 145–46]. Thus, the Court's analysis is limited to whether those specific allegations, included in the complaint, sufficiently state a claim for abuse of process under Tennessee law.

First, it is unclear whether the filing of an involuntary bankruptcy petition to exert pressure for payment of a debt could even constitute the use of process after it has been issued, but rather, would appear to be more akin to the filing of a lawsuit, for which a claim of abuse of process cannot lie. *See Bell*, 986 S.W.2d at 556. Regardless, the Court finds that plaintiff has not stated a claim for abuse of process based on the filing of the involuntary bankruptcy proceeding. Plaintiff notes in its response brief that it is contesting the filing of the involuntary proceed as being filed in bad faith [Doc. 16, p. 20 n.1]. But the Court takes judicial notice that, since the filing of the motion to dismiss, the bankruptcy court has determined that plaintiff has not shown that defendants filed the involuntarily bankruptcy petition in bad faith [Case No. 3:25-bk-31122, Doc. 115, p. 256 ("I find that Echo MAV has not proven that Horizon31 filed the petition in bad faith"); Doc. 108, p. 1 ("The Court . . . announced its finding that Horizon31, LLC did not file the involuntary petition in bad faith")]. This would seem to foreclose any conclusion in this action that the filing of

the involuntary bankruptcy petition was itself an "abuse of process" within the meaning of Tennessee law.

Further, to the extent that plaintiff's claim rests on the disclosure of the bankruptcy proceeding to third parties, it is unclear how such disclosure could be deemed "the use of process," for purposes of an abuse of process claim. *See Bell*, 986 S.W.2d at 555. In other words, the allegations relating to the disclosure of the pending bankruptcy proceeding to third parties does not, in itself, use any process of the bankruptcy court. Accordingly, the Court finds that plaintiff has not plausibly stated a claim for relief in this regard.

For these reasons, defendants' motion to dismiss will be **GRANTED** as to this claim, and plaintiff's claim for abuse of process will be **DISMISSED**.

## H. Amendment

Turning to one final matter, the Court notes that, in its response brief, plaintiff states that, should the Court grant defendants' motion to dismiss in whole or in part, it should grant plaintiff leave to amend and replead any deficient allegations [Doc. 16, p. 22].

In this circuit, district courts are not "required to invite an amended complaint when a plaintiff has not moved to amend and submitted a proposed amended pleading." *Crone-Schierloh v. Hammock*, No. 2:12-cv-410, 2013 WL 12123903, at \*4 (S.D. Ohio May 22, 2013) (citing *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545 (6th Cir. 2008) (stating that "[n]o abuse of discretion occurs when a district court denies a party leave to amend where such leave was never sought")). Thus, "in the Sixth Circuit, unless a plaintiff requests to amend a deficient complaint with sufficient factual allegations in response to a

36

meritorious Rule 12(b)(6) motion, the dismissal under Rule 12(b)(6) should be with prejudice." *Id.*

Indeed, the Sixth Circuit has stated that "if a party does not file a motion to amend or a proposed amended complaint, it is not an abuse of discretion of the district court to dismiss the claims with prejudice." *CNH Am. LLC, v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.*, 645 F.3d 785, 795 (6th Cir. 2011). The Sixth Circuit has reasoned that "[r]equiring the district court to both state the reasons for its dismissal and then allow [plaintiff] to amend the [c]omplaint without [plaintiff's] having asked permission would be akin to mandating the district court to issue an advisory opinion." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 573 (6th Cir. 2008). And "[p]laintiffs are not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *Id.* (alterations omitted) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004)).

Here, plaintiff's request in its response brief amounts to a request that, if the Court rules in defendants' favor on any portion of the motion to dismiss, that plaintiff be permitted to file an unspecified amendment to its complaint to cure the deficiencies found by the Court. The Court does not find that waiting for a determination as to whether the complaint adequately states a claim and then seeking to amend based on the Court's ruling to be a proper procedure. Accordingly, plaintiff's request to amend in light of any determined deficiencies is **DENIED**.

37

## IV.     Conclusion

For the reasons above, the motion to dismiss [Doc. 13] is **GRANTED in part** and **DENIED in part.**  Specifically, plaintiff's claims of fraudulent inducement (Count 2), conversion (Count 4), misappropriation of trade secrets under the TUTSA and the DTSA (Counts 5 & 6) and abuse of process (Count 10) are **DISMISSED**.  This case will proceed only as to plaintiff's claims for declaratory judgment (Count 1),[3] tortious interference with business relationships (Count 3), breach of fiduciary duty (Count 7), and violations of the TPCCA and the CFAA (Counts 8 & 9).

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[3]  Defendants did not seek to dismiss Count 1 in their motion to dismiss, and therefore, that count is not addressed in this memorandum opinion and order.

38